J^MOORE, J.
The defendant, Paul Ripley, Jr., was convicted of theft and sentenced to five years at hard labor with credit for time served, the first year to be served without benefits and the remaining four years suspended. Defendant was placed on supervised probation and ordered, as a special condition of probation, to pay restitution in an amount determined by the probation officer, but not less than $15,000, to be paid within sixty days of his release from incarceration. Defendant appeals his conviction and sentence. For the reasons that follow, we vacate and set aside the conviction and sentence.
Facts
This case presents the issue of whether the evidence that the defendant defaulted on a contractual obligation involving the lease of radio air time by failing to pay for half the rental arrearage and issuing a check for same that was returned is sufficient to establish beyond a reasonable doubt that the defendant committed the crime of theft. La. R.S. 14:67.
On August 80, 1999, Mr. John Kotmair of Liberty Works Radio Network (“LWRN”) entered into a “time brokerage agreement” with Charles “Chuck” Redden/Red Bear Broadcasting Corporation. Under the terms of the agreement, LWRN would provide all of the programming for the radio station. LWRN also acquired the right to sell advertising and collect all advertising revenue from the station. In exchange, LWRN agreed to pay rent of $3,500 per month. Additionally, LWRN would pay the expenses of the radio station, including electricity, FCC regulation fees, insurance, telephone bills and other operating expenses. The term of the agreement was approximately three years beginning October 15, 1999, | .¿according to Redden. At the end of the three years, LWRN would have the option to purchase the radio station by making a balloon payment. A predetermined amount from each $3,500 monthly payment would be applied toward the purchase. Redden testified that things went fine the first year; however, around November or December of 2000, LWRN began to fall behind on its monthly payments. In early 2001, it was 60 days in arrears. During this time, LWRN continued to pay its operating expenses and kept the station on the air.
Redden contacted Kotmair when the monthly payments became 90 days past due. Kotmair explained to Redden that the station was having managerial difficulties and problems getting bills sent out to advertisers for payment. Kotmair told Redden that he was trying to get a new manager brought in to the area, and he would get things caught up as soon as possible. Redden testified that the new manager brought in was Steve Reed. He said that he came to know Reed, and Reed did run the station and sell some advertising. '
By July of 2001, LWRN was approximately six months or $21,000 in arrears for the monthly payments. Redden testified that on a couple of occasions he even had to pay the electric bill or the telephone bill out of his own pocket. He admitted, however, that he was reimbursed by LWRN for those payments. Kotmair told Redden that he was working on putting together some investors in the station. Around this time, he referred Redden to Mr. Paul Ripley, the defendant in this case, allegedly stating that Ripley was handling the financial problems of LWRN. Ripley told Redden that [ oLWRN had investors lined up, and they would be getting their finances in order.
By August, according to Redden, the network owed him approximately $30,000 *1217 in monthly payments and contractual penalties. He contacted Ripley and demanded payment, or he would shut down the station. Ripley asked what it would take to keep the station operating. Redden agreed to allow the station to continue operation in exchange for an immediate payment of $15,000. Ripley sent Redden a check for $15,000 drawn on his bank account in Maryland on September 29, 2001.
Redden deposited the check in his account at his local bank. The check was subsequently returned to Redden because of “uncollected funds,” meaning that, although the maker (Ripley) had made a deposit to his account that would cover the check, those funds had not been collected yet. Redden contacted Kotmair, who again told him to call Ripley. Ripley expressed surprise about the check and told Redden to run the check through again. Redden and his banker contacted the bank to ascertain if the check would clear. Redden testified that they were told that it would not clear. They continued to call the bank for two more weeks. Each time, according to Redden, they were told the funds were not available. Redden also called the defendant several times about the check, but he never received payment. Redden stopped LWRN’s operation of the station on January 15, 2002.
Ripley was not charged with La. R.S. 14:71, “issuing worthless checks;” instead, he was charged by bill of information with “theft by fraud” |4the following month on February 26, 2002. He filed a motion to quash the bill of information as defective on August 6, 2003, the day trial began. The motion was denied. Defendant waived his right to a jury trial. He orally moved for acquittal after the state rested. The trial court denied the motion for acquittal. After recessing on August 7, 2003, and due to scheduling conflicts, trial resumed on November 5, 2003, and defendant was found guilty. The court ordered a pre-sentence investigation. Defendant was sentenced on January 13, 2004, to five years at hard labor with credit for time served, the first year to be served without benefits with the remaining hard labor sentence suspended.[1] The defendant was placed on supervised probation and ordered to pay, as a special condition of probation, within 60 days of his release, an amount to be determined by the probation officer, but not less than $15,000.
Discussion
Defendant raises nine assignments of error on appeal:
1. The Trial Court erred in failing to grant defendant’s motion for directed verdict of acquittal on the basis that there was no evidence of intent by defendant to permanently deprive anyone of anything of value.
2. The Trial Court erred in failing to grant defendant’s motion for directed verdict of acquittal on the basis that there was no evidence of intent by defendant to take anything or obtain the owner’s consent by means of fraudulent conduct.
3. The Trial Court erred in failing to grant defendant’s motion for post judgment [sic] verdict of acquittal when the evidence, viewed in light most favorable to the State, did not permit the trier of fact to find beyond a reasonable doubt that defendant was guilty of having intent to permanently deprive anyone of anything of value.
|b4. The Trial Court erred in failing to grant defendant’s motion for post judgment [sic ] verdict of acquittal when the evidence, viewed in light most favorable to the State, did not permit the trier of fact to find beyond a reasonable doubt *1218 that defendant was guilty of a taking by means of fraudulent conduct or representations.
5. The Trial Court erred in convicting defendant under La. R.S. 14:67 without proof beyond a reasonable doubt of intent to permanently deprive anyone of anything of value.
6. The Trial Court erred in convicting defendant under La. R.S. 14:67 without proof beyond a reasonable doubt that defendant misappropriated anything without the consent of the owner or obtained consent by means of fraudulent conduct or representations.
7. The Trial Court erred in convicting defendant under La. R.S. 14:67 without proof beyond a reasonable doubt of the specific value of the thing taken.
8. The Trial Court erred in overruling defendant counsel’s objection and allowing speculative testimony by Charles Redden as to the value of the radio air time.
9. The Trial Court erred in failing to quash the bill of information for failure to charge an offense punishable under a valid statute.
By his first two assignments, defendant argues that the trial court erred in denying defendant’s motion for directed verdict of acquittal. Denial of a motion for acquittal should be reversed if the state’s evidence is insufficient to sustain a conviction. La. C. Cr. P. art. 778. Hence, the standard of review is essentially a sufficiency of evidence analysis.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Hunter, 33,066 (La.App. 2 Cir. 9/27/00), 768 So.2d 687, writs denied, 2000-3070 (La.10/26/01), 799 So.2d 1150, 2001-2087 (La.4/19/02), 813 So.2d 424. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2 Cir. 9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
In this instance, the defendant was charged with theft under La. R.S. 14:67:
A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject *1219 of the misappropriation or taking is essential. (Emphasis ours).
|7The trial court expressly found that the object of the contract between Red Bear and LWRN constituted a thing of value for purposes of the theft statute. It concluded that through his misrepresentations, Ripley had specific intent to defraud Redden of the broadcasting rights, etc., and to permanently deprive Redden of revenues he would have earned during the months in question. The court found that the state carried its burden of proving the value of the thing misappropriated by introducing the check into evidence.
Defendant’s first six assignments essentially allege that the state failed to provide sufficient evidence for the elements of theft highlighted above, namely, that the defendant misappropriated or took anything of value, without the consent of Redden, or by means of fraudulent conduct, practices, or representations; nor did the state show that defendant intended to deprive ... [Redden] permanently of the object of the theft. The state presented evidence of these elements as follows.
“Anything of value”
Our law mandates the term “anything of value” be afforded “the broadest possible construction” and “construed in the broad popular sense of the phrase” instead of defined simply as “property.” La. R.S. 14:2(2). It includes anything of “the slightest value, movable or immovable, corporeal or incorporeal.” Id.
The bill of information charged that the defendant intentionally misappropriated the “lease of a radio station ... valued at $15,000” between September 28, 2001 and September 29, 2001, both dates inclusive. At trial, |showever, the state identified as things of value both the continued use of the radio station after defendant failed to make payment and Redden’s loss of air time revenues. Use of the radio station is arguably incorporeal, but little precedent exists as to theft of incorporeals. See State v. Jones, 544 So.2d 1209 (La.App. 3 Cir.1989) (where unauthorized credit granted toward utilities was considered incorporeal thing of value susceptible to theft).
Redden testified that but for defendant’s repeated representations assuring payment, he (Redden) would have taken the station back, and he could have profited in the months of September, October, November and December of 2001 from revenues made by airing football games. In the past, he testified, the station made between $4,000 and $5,000 per month during football season by airing high school and college football games.
The prosecutor valued the loss of air time at $15,000 based upon the amount of the check written by the defendant, although the check was for payment on the arrearage amounting to $30,000, explaining at oral argument that the check was tangible evidence. Hence, the state identified the air time of the station as the thing of value misappropriated by the defendant by fraud, its value being represented on the one hand by the money Redden would have received from advertising revenues, and on the other hand by a $15,000 check written by the defendant for past due rent.
Despite these evidentiary anomalies, we conclude that the air time during the fall months of 2001 was something of value for purposes of the theft statute. This air time was the object of the contract between LWRN and Red Bear. Redden testified that he would not have continued to allow | gLWRN to use this irretrievable air time during those months were it not for the defendant’s assurance that he would be paid.
Without the consent of, or by means of fraudulent conduct, practices
The necessity of specifying the misappropriated “air time” during the fall *1220 months of 2001 as the “thing of value” in this case highlights the difficulty of this case for the state. LWRN was in possession of the radio station and using the air time by virtue of a contract. Hence, on the one hand, Redden consented to LWRN’s use of the air time. The state’s position, however, is that Redden was induced in late September of 2001 to refrain from taking over the station by Ripley’s fraudulent conduct, practices and representations, namely by writing a check for $15,000 to Redden, representing payment on the antecedent debt of $80,000 under the contract. This fraud allegedly consisted of Kotmair’s and Ripley’s representations that investors in LWRN had been lined up and their promises to eventually pay the arrearages, and the check for $15,000 from Ripley for the antecedent $30,000 debt in order to keep the station operating. Ripley sent Redden a check for the $15,000 on September -29, 2001, but the check was returned to Redden 4 or 5 days later for “uncollected funds.” Hence, the question is whether Ripley’s conduct as presented by the evidence is sufficient to constitute fraudulent practices, conduct or representations.
In State v. Bias, 400 So.2d 650 (La.1981), a defendant who defaulted on a contractual obligation by failing to pay monthly rental payments on a television was charged and convicted of unauthorized use of hna movable. Defendant made the first six payments in the rent-to-own contract with a furniture company before he defaulted. When the furniture company contacted him, the defendant promised to bring his payments current. However, he failed to do so and also failed to return the television, although the defendant testified that representatives from the company came to his apartment and retrieved the TV. The state prosecuted the defendant for unauthorized use of a movable, a violation of La. R.S. 14:6. Defendant appealed his conviction.
A person commits the crime of unauthorized use of a movable when he either takes or uses another’s property without the owner’s consent or by means of fraudulent practices. La. R.S. 14:68. The court in Bias noted that [unlike theft], although the statute does not require that a person act with an intent to deprive the owner permanently (otherwise, it would be theft), the statute must be construed to require the existence of fraudulent intent. Bias, supra at 652. Intent to defraud must be present, the court noted, or otherwise every breach of a rental contract would be within the reach of the statute.
The Bias court observed that the state’s theory must be that either the “use” of the movable was without the owner’s consent when the defendant failed to pay his rent, or that the “use” was obtained by means of fraudulent intent. It concluded that the failure to make rental payments as agreed constituted neither “use without consent” or “use by fraudulent practices.” With regard to the latter, the court stated that the evidence that the defendant declined to return the TV after failing to pay rent and moved to ajj^new residence without notifying the obligee in breach of the contract was not enough to carry the state’s burden viewed in a light most favorable to the state. Id.
The facts in the instant case are analogous to those in Bias, except with the addition of the $15,000 check returned to Redden. Although the crime of “unauthorized use of a movable” is distinguishable from “theft” in that in the former crime there is no intent to deprive the owner permanently of the movable, both crimes have the same element that the thing of value must be taken “without ... consent, or by means of fraudulent conduct, practices or representations.” La. R.S.14:68. To support the conviction, then, the state’s evidence must show that either the defen *1221 dant took the radio station’s air time without Redden’s consent, or he took it by means of fraudulent conduct, practices or representations. As previously noted, the bill of information clearly indicates that the state’s theory is that Ripley took the radio station’s air time by fraudulent practices, since, in point of fact, Redden consented to LWRN’s continued use of the radio station until January 15, 2002, even after the defendant’s check failed to clear.
Redden testified that he spoke with Kot-mair in late July or early August and told him that if the network was not going to make it, then to let him repossess the station, and he would work out some kind of repayment plan with him. He said that Kotmair told him that they had big money coming. Around that time, August 15, 2001, Redden spoke with Ripley regarding the $30,000 arrearage. At some point, he apparently threatened to take LWRN off the air because he said Ripley asked him how much money 112would he have to send to keep him from taking the radio station back. Redden testified: “I said, I need at least half of that money, I’ll carry him [Kotmair] on for the rest of that thirty thousand ($30,000) and I will work with you guys to get caught up.”
The state placed into evidence a check from Paul Ripley, Jr. dated September 29, 2001 (some six weeks after the date of the conversation above) in the amount of $15,000 written to Redden for LWRN. Redden testified that the check stopped him from proceeding with his plan to take over the station. He endorsed and deposited the check. The check did not clear and was returned on October 4, 2001. Redden initially stated that he tried to run it through a second time with the same result; however, it appears that the check was actually deposited only once. Thereafter, he testified that he and his banker made numerous calls over the next two weeks to defendant’s bank to see if the check would clear and they were told that the money to cover the check was not in the bank. Based on this testimony, the trial court found that Redden presented the check twice for payment.
When the check was returned for uncollected funds, Redden stated that he called Ripley, and Ripley expressed surprise that the check had not cleared. He told Redden to run it through again. Ripley testified that the problem arose because the checks that he deposited were from an investor drawn on a | ^foreign bank. Even though he wrote the check to Redden after the deposit, the funds for the deposited check(s) had not been collected. He testified that it sometimes could take months to clear a check drawn on a foreign bank. Meanwhile, Redden said he had his banker call Ripley, but he never received his money. Redden turned the check over to authorities for collection soon thereafter. Ripley was sent a notice on November 15, 2001 from the Check Collections Office of the District Attorney for Morehouse and Ouachita Parishes. The trial court found that Ripley’s testimony and explanations were not credible. Based upon that finding and the “worthless” check, it concluded that Redden was prevented from taking back his radio station and lost valuable air time due to Ripley’s misappropriation by fraud.
After review, we conclude that the evidence is simply not sufficient to support a finding that the thing of value in this case was taken without Redden’s consent or that it was misappropriated by fraudulent practices. LWRN entered into a contract with Red Bear/Chuck Redden with a three year term. LWRN kept current on its obligations under the agreement for over a year before it started having financial problems. Redden was informed of LWRN’s financial problems. Nevertheless, Redden allowed LWRN to continue to *1222 operate as it became increasingly in. arrears for the rent amount. It is noteworthy that LWRN continued to pay its operating expenses to stay on the air. During this time, Redden could have invoked his rights under the contract and moved to take back possession of the station. Instead, Redden repeatedly pressed Kotmair and Ripley for his rent money. Kotmair and Ripley promised that the money for the rent would be coming. They were trying to find investors in the station. The money never came. The failure to pay rent, standing alone, does not meet the element 114required by the statute for theft by fraudulent practices. State v. Bias, supra.
Nor can we conclude that Ripley’s check for the antecedent debt (not for the thing of value allegedly misappropriated) proves that Redden was induced by fraud to consent to LWRN’s subsequent use of the station’s air time in the fall of 2001. Redden himself testified that he decided to take the station back on August 15, 2001. He claims that he was fraudulently induced to forbear that action when he received a check on September 29, six weeks later. The check was returned for “uncollected funds” on October 4 or 5. Uncollected funds signified that Ripley had made a deposit prior to writing the check that had not cleared yet, so the funds were unavailable. Shortly after the check was returned to him, Redden turned the check over to the district attorney’s office for collection. The Check Collections Office sent notice to Ripley on November 15 that he would be prosecuted if payment was not made in 10 days. Hence, although Redden was pursuing criminal charges against Ripley for the check, he still did not attempt to terminate the agreement or evict LWRN, and in fact, demanded payment for the radio air time up until January 15, 2002.
The facts led to the conclusion that Redden was well aware that LWRN was in arrears and was unable to meet its rent obligation. He knew that the radio station was in serious financial trouble several months before the alleged misappropriation in September of 2001. He nevertheless consented to LWRN’s continued use of the station in hopes of eventually receiving his money and possibly selling the station. He received the check on September 29, and the check was returned on October 4 due to |1Buncollected funds. Redden therefore was clearly on notice when he discovered that the check was no good. He nevertheless continued to allow LWRN to operate for four more months, although he waited a few weeks before turning the check over to authorities for collection. It is thus untenable for Redden to insist that he was induced by fraud to forbear from taking his radio .station back until January 15, 2002 due to the bad check, while at' the same time he was pursuing criminal charges in early November for the check.
We conclude that Redden consented to LWRN’s continued use of the station, and he was not defrauded into doing so. Redden is clearly a savvy businessman. He likely believed that his best and only chance to get his money was to allow LWRN to continue operating and possibly locate some investors, while at the same time applying all the pressure he could to getting his money. Ripley’s promises and ultimate failure to pay LWRN’s arrearage as promised is insufficient evidence to prove that Redden was induced by fraud to stop his planned takeover of the station for ■ four more months. Moreover, the court’s conclusion that the check amount represented a baseline for the thing of value misappropriated for purposes of establishing the grade of theft is clearly not supported by the evidence. The evidence demonstrates that the amount of the *1223 check, $15,000, represented half of the $80,000 arrearage due to Redden for past due rent and not the “thing of value” allegedly misappropriated. Redden testified that he agreed to refrain from taking the station back if he were paid this amount.
| |fiIntent
The trial court determined that Ripley had specific intent to defraud Redden or Red Bear based upon the following: Ripley’s repeated representations that the arrearage would be paid; his giving Redden a $15,000 negotiable instrument as “an inducement to prevent Mr. Redden from taking steps to reclaim the radio station and to reclaim those broadcasting rights,” which instrument was subsequently dishonored twice; and, that in November of 2001, after Redden turned the check over to officials for collection or prosecution, Ripley said to Redden “Since you done that, I’ll pay you back ten dollars per month until you die under Louisiana hot check law.” The court concluded that these factors taken together could be construed to show specific criminal intent to permanently defraud Mr. Redden/Red Bear of something of value.
Intent, as required by La. R.S. 14:67, is interpreted as general criminal intent because there are no qualifying provisions limiting the element to specific intent. La. R.S. 14:11. Accordingly, the defendant must have reasonably foreseen criminal consequences would result from his act or failure to act. La. R.S. 14:10. Although intent is a question of fact, it does not need to be proven as a fact but can instead be inferred from circumstances of the transaction and actions of the defendant. State v. Sepulvado, 93-2692 (La.4/08/96), 672 So.2d 158, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Johnson, 31,448 (La. App. 2 Cir. 3/31/99), 747 So.2d 61, writ denied, 99-1689 (La.11/12/99), 749 So.2d 653, cert. denied, 529 U.S. 1114, 120 S.Ct. 1973, 146 L.Ed.2d 802 (2000). To prove intent, [17the state must show defendant acted or represented himself in a manner to deprive Redden of something of value.
Redden testified that after defendant’s check failed to clear, he continued to allow LWRN to operate the station because the defendant assured him the funds would clear if he tried again. Although the check was not actually deposited again, Redden and his banker telephoned officers at the bank upon which the funds were to be drawn several times over the following two weeks, and they were told that the check would not clear. The trial court concluded that Redden “presented” the check twice for payment. Redden also testified that the defendant still promised payment in the several conversations that ensued. The exchanges became more heated, however, after Redden turned the check over to the Check Collections Office. Also, in November 2001, apparently out of anger, Ripley told Redden something along the lines that he would pay him $10 per month until he died under the state’s hot check law. Defendant was subsequently arrested and charged with theft. The debt was never paid.
Defendant in this case did not physically take control of the radio station, remove the radio station, take physical possession of the lease of the radio station, or do anything within the scope of common theft. LWRN was the “person” who obtained the use of the station by contract, and the defendant’s relationship to LWRN is not at all clear from this record.
Ripley testified that he was simply a friend of Kotmair’s who was asked to help them raise money for the fledgling radio network. He explained that he would later charge the company a fee for obtaining 11sinvestors in the venture. After little initial success in obtaining investors, he *1224 testified- that a Mr. Daniel Wattlington of North Carolina, had agreed to help line up an investor, who agreed to invest 2.725 million dollars into LWRN. According to Ripley, LWRN did not have an Employer ID number, and therefore the investor would not lend money directly to LWRN. This particular investor, a Mr. Lane, was a private investment banker and owner of Vista Bank of Grenada. Vista Bank had an office in Atlanta. The agreement was that Lane would issue Ripley the checks, and Ripley would in turn make UCC-1 security interest filings on LWRN’s 98 radio station affiliates and LWRN would sign a promissory note for the money. The security interests consisted of both those stations that LWRN owned outright and those which merely had time marketing agreements. The evidence showed that Ripley was issued three cashier’s checks from Global Commeree/Vista Bank. The first check, dated September 18, 2001, was for $125,000. Ripley testified that he deposited $100,000 of the check on September 28, 2001 at 9:24 a.m., and a $25,000 cashier’s check was issued to Wattlington as payment of his 4% finder’s fee[2]. He testified that a Mrs. Lowery at the bank told him that the funds would be' available the next day because it was a cashier’s check. The defense introduced copies of two additional cashier’s checks for 1.3 million dollars each dated October 2, 2001, and payable to Paul Ripley. Ripley also deposited these checks in his account at Prince George’s Federal Savings Bank in Upper Marlboro, Maryland. Finally, the defense introduced into evidence the deposit slips |1fland also two bank statements of Ripley’s “Consulting Services.” The first statement showed the initial $100,000 balance from the first check deposited. Ripley explained that he initially learned of a problem with the deposit when his bank notified him on or about October 4, 2001, that it had mistakenly processed the first cashier’s check as a check drawn on a domestic bank and thus it was routed incorrectly. Because the $125,000 cashier’s check was actually drawn on a foreign bank, the check was returned to the bank to be re-routed. Ripley discovered this about the time he deposited the second two checks. According to a document from the Federal Reserve Bank of Charlotte placed into evidence, the three cashier’s checks for a total of 2.75 million dollars drawn on Vista Bank were routed from Charlotte to the foreign bank for payment on - October 9 and -10, and they were returned on February 8, 2002 uncollected. Ripley testified that he had written $270,000 of checks based upon his belief that the “uncollected funds” were available in the account; among them was the $15,000 check to Redden.
The trial court determined that the defendant was not a credible witness and apparently disregarded the documentary evidence of the bank transactions that tend to support Ripley’s story. We conclude, however, that without evidence that the documents were patently fraudulent, the evidence is insufficient to prove beyond a reasonable doubt that the defendant intended to defraud Redden.
The state insists that intent to deprive was established beyond a reasonable doubt by the circumstances of the transaction. As previously jgpnoted, the failure to make promised rental payments under an agreement does not constitute evidence of fraud or intent to defraud. State v. Bias, supra. We also previously stated in Redden v. Ripley, 37,905 (La.App. 2 Cir. 12/10/03) 862 So.2d 469, that the mere dishonor of a check for uncollected funds is not, in and of itself, evidence of any wrongful or dishonest conduct which should sub- *1225 ject the drawer to the harsh penalties of R.S. 9:2782. The penalties under that statute are punitive, and therefore strictly construed, and are awarded when it is clearly shown that the intent to defraud is present. If this conduct is insufficient for civil sanctions, then, a fortiori, it is insufficient for criminal sanctions.
“Permanently Deprive”
Even if the state established- beyond a reasonable doubt the other elements of theft, we conclude that it could not show that the defendant intended to 'permanently deprive Redden of the radio station air time. The state proposes Redden was deprived of the radio station’s use during the fall months of 2001 through January 2002 by defendant’s representations, and he cannot get those particular months of use back. We disagree. The loss of use for several months is not permanent deprivation, and although Redden lost those months of use, he had already planned contractually to do so for a price. Therefore, the thing permanently deprived is arguably not lost use, but rather lost profit. Defendant’s alleged misrepresentations may have extended-.-the time Redden allowed LWRN to use the station, thereby costing him additional money. But to prove permanent deprivation, the thing of value would have to be identified by the state as a monetary loss |aidue to breach of contract, as opposed to lost time or the lease of the radio station as the bill of information reads.
Because we have determined that the evidence is insufficient to establish beyond a reasonable doubt that the defendant committed a theft, consideration of defendant’s other assignments are rendered moot. We note on patent error review, however, that the sentence imposed by the trial court is both illegal and indeterminate.
Defendant was convicted of theft in violation of La. R.S. 14:67(B)(1), and the penal clause for that statute at the time of offense was that the offender be “imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.” The court mandated that the first year of defendant’s sentence be without benefit of parole, probation or suspension of sentence. The trial court had ho authority to deprive defendant of those listed benefits.
We further note, the trial court also imposed a condition of probation in accordance with La. C. Cr. P. art. 895(A)(7) when it required that the defendant make restitution for the loss caused by the offense. The statute requires that the amount be determined by the court. La. C. Cr. P. art. 895.1(A)(1) requires that the court order “restitution in a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain.” That amount is to be paid in lump sum or monthly installments depending upon the defendant’s earning capacity and assets. By allowing the probation officer to determine the amount of restitution upon defendant’s release from incarceration, the court improperly delegated its own necessary action to the Reprobation officer and allowed defendant a suspended sentence without naming the amount of restitution to be made. Furthermore, the court made no showing of analyzing defendant’s earning capacity and assets before assigning the payment deadline of 60 days after release from prison. This portion of the sentence is indeterminate.[3]
*1226 Conclusion
This case is essentially a civil breach of contract case arising out of the failure to pay rent. It is paramount that criminal intent, one of the several essential elements the state must prove for the crime of theft, be clearly established by the evidence.
For the reasons above, we conclude that the state presented insufficient evidence to prove beyond a reasonable doubt that the defendant committed the theft charged in this case. We therefore reverse the trial court’s judgment, vacate and set aside the defendant’s conviction and sentence.
REVERSED; CONVICTION AND SENTENCE VACATED.

. Defendant was sentenced under La. C. Cr. P. art. 893(A).

. This check was also ultimately returned uncollected.

. The court failed to consider that Ripley obtained a civil judgment for $15,000 affirmed by this court. Redden v. Ripley, 37,905 (La.App. 2 Cir. 12/10/03), 862 So.2d 469.