NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-408

STATE OF LOUISIANA

VERSUS

FELTON ALLEN

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 06-1509
HONORABLE GERARD B. WATTIGNY, PRESIDING
\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Michael G. Sullivan, and Billy Howard Ezell, Judges.

**AFFIRMED.**

J. Phil Haney, District Attorney
Jeffrey J. Trosclair, Assistant District Attorney
Courthouse, 5th Floor
Franklin, LA 70538
(337) 828-4100
COUNSEL FOR APPELLEE:
        State of Louisiana

Mark O. Foster
Louisiana Appellate Project
P.O. Box 2057
Natchitoches, LA 71457
(318) 572-5693
COUNSEL FOR DEFENDANT-APPELLANT:
        Felton Allen

**COOKS, Judge.**

_____FACTS AND PROCEDURAL HISTORY

Marenthia Nelson Allen used the identity of Mrs. Lori N. Boyd to purchase three motor vehicles from Musson-Patout Automotive Group and pled guilty to three counts of theft over $500.00. One of the vehicles fraudulently purchased by Mrs. Allen, a 2006 Chevrolet pickup truck, was driven by Mrs. Allen's husband, Felton Allen from the time it was purchased.

Based on the fact that he drove the stolen vehicle, the State charged Mr. Allen by bill of information with illegal possession of a stolen thing valued over $500.00, a violation of La.R.S. 14:69(B)(1). A jury trial on the merits was held, and Defendant was found guilty as charged. Defendant was sentenced to serve five years at hard labor with credit for time served. All but one year of the sentence was suspended, and Defendant was placed on five years active supervised probation after his release. Defendant did not seek reconsideration of his sentence. On appeal, he asserts that the evidence was insufficient to support his conviction.

_____ANALYSIS

In his sole assignment of error, Defendant argues the State failed to establish all the elements of proof required to establish that he was guilty of illegal possession of a stolen thing. Specifically, Defendant maintains his conviction was based on the State's allegation that the 2006 Chevrolet truck used by him was stolen or misappropriated from Musson-Patout Automotive by his wife, Mrs. Allen. Defendant contends, although his wife purchased the vehicle under another person's name, she fulfilled her part of the contract and paid the purchase price of the vehicle. Because there was no theft from the dealership, Defendant asserts he cannot be guilty as charged.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As provided in La.R.S. 14:69(A), "Illegal possession of stolen things is the intentional possessing, procuring, receiving, or concealing of anything of value which has been the subject of any robbery or theft, under circumstances which indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses." In the instant case, the Defendant challenges only the element of theft. Theft is defined in La.R.S. 14:67 which reads in pertinent part:

> A. Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

Considering same, Defendant contends that Musson-Patout contractually agreed to sell the vehicles to Mrs. Allen and that the vehicles belonged to her when they were driven off the lot. Thus, a theft did not occur. Defendant asserts the actual victim of Mrs. Nelson's fraud was Hibernia Bank, which loaned her the money to purchase the vehicles.

In support of his argument, Defendant first refers this court to *State v. Bias*, 400 So.2d 650 (La.1981). In *Bias*, the supreme court addressed the issue of whether the defendant's default on a contractual obligation involving the lease of movables by failing either to make the rental payments or to return the movable was alone sufficient to establish beyond a reasonable doubt that the defendant committed unauthorized use of a movable pursuant to La.R.S. 14:68. The court concluded that the failure to make rental payments as agreed did not constitute a "use without consent" or a "use by fraudulent practices" for purposes of the statute, stating:

> R.S. 14:68 may be violated by a taking or use either without the consent of the owner or by means of fraudulent conduct, practices, or representations. Here, the state's theory must be either (1) that the "use" of the movable was without the owner's consent, when defendant discontinued paying rent, or (2) that the "use" was by means of fraudulent practices, when defendant kept the set without making the agreed payments. We decline to accept a theory that the mere failure to make rental payments as agreed constitutes a "use without consent" or a "use by fraudulent practices" for purposes of the statute.

*Id*. at 652.

The Defendant also relies on *State v. Ripley*, 39,111 (La.App. 2 Cir. 12/15/04), 889 So.2d 1214, *writ denied*, 05-151 (La. 6/24/05), 904 So.2d 718, wherein the court, relying on the holding in *Bias*, concluded that the evidence was not sufficient to support a finding that the thing of value, air time, was taken without the broadcasting corporation's consent or that it was misappropriated by fraudulent practices. The defendant, a radio network, entered into a three-year contract with a broadcasting corporation and kept current on its obligations under the agreement for over a year before it started having financial problems. The broadcasting corporation was informed of the defendant's financial problems but, nonetheless, allowed the defendant to continue to operate as it became increasingly in arrears for the rent amount. On appeal, the court held that the failure to pay rent, standing alone, did not

meet the element required by the statute for theft by fraudulent practices.

The facts of the instant case are substantially different than those of the jurisprudence cited by Defendant. First, the testimony and evidence adduced at trial support the fact that Mrs. Allen never had any intention of paying for the 2006 Chevy pickup truck, the possession of which formed the basis of Defendant's conviction for illegal possession of a stolen thing having a value greater than $500.00. From the very outset of the sales transaction, the record indicates that the 2006 Chevy pickup truck found in the Defendant's possession was fraudulently obtained by his wife and by Defendant himself. The sales transaction was not supported by a valid contractual agreement, and Mrs. Allen was not able to make payments on the vehicle.

At trial, the parties stipulated to the fact that Mrs. Allen pled guilty on March 8, 2007, to identity theft over $1,000.00 and to three counts of theft over $500.00. The factual basis for her plea indicated that she used the identity of Lori N. Boyd to purchase three motor vehicles from Musson-Patout Automotive Group and items from Conn's, including furniture. The 2006 Chevy pickup truck was one of the three vehicles involved in the three counts of theft over $500.00. Thus, the element of theft, the misappropriation or taking of the 2006 Chevy pickup truck belonging to Musson-Patout, by means of fraudulent conduct, practices, or representations, with the intent to permanently deprive Musson-Patout of the pickup truck, was stipulated to or proven at trial.

On appeal, Defendant has not challenged any of the remaining elements of the crime for which he was convicted. We note, however, that the record contains sufficient evidence of the remaining elements: (1) intentional possessing, procuring or receiving the pickup truck; and, (2) under circumstances which indicate that the Defendant knew or had good reason to believe that the pickup truck had been

misappropriated by fraud.

Detective Jeffrey L. Matthews of the Iberia Parish Sheriff's Office received a complaint that identity theft had occurred, and with the use of the stolen identity, three vehicles had been purchased from Musson-Patout, a 2006 Chevy HHR, a 2006 Chevy pickup truck and a 2006 Malibu. Detective Matthews located two of the vehicles, the 2006 Chevy HHR and the 2006 Chevy pickup truck at the local Wal-Mart. Defendant was driving the pickup truck and a woman was driving the HHR. Detective Matthews stated that he followed the vehicles to the residence of the Defendant and his wife.

As part of the investigation of the complaint, Detective Matthews went to Musson-Patout to look into the purchases. After showing the sales clerk two photo lineups of six people each, it was determined that Mrs. Allen was portraying Lori Boyd at the time she purchased the vehicles. After several days of surveillance of the Allen residence and noticing all three vehicles parked at the residence during the surveillance, Detective Matthews obtained a search warrant. At the time of the search, the pickup truck and HHR were in the garage. Inside the pickup truck, an officer found a copy of Lori Boyd's driver's license and Social Security card. Meanwhile, Detective Matthews searched inside the residence. In the master bedroom of the residence, Detective Matthews found the couple's marriage license and payment books for vehicles purchased under Lori Boyd's name. A deed to the house was found in a briefcase which indicated that the couple purchased the house together. Bills from Cingular, Kentwood Springs, Progressive Direct Insurance and BellSouth, Center Point Energy and seven payment booklets from Hibernia, Conn's and Iberia Bank, all in Lori Boyd's name, were also found.

Yorick Blake Chachere, the GM sales manager at Musson-Patout at the time

Mrs. Allen purchased the vehicles, testified that Defendant accompanied Mrs. Allen to the dealership to pick out the pickup truck that she purchased for him. Mr. Chachere stated that Mrs. Allen used the name Lori Boyd during the sale and listed the name Felton Allen as a personal reference in her credit application. According to Mr. Chachere, Defendant was present when Mrs. Allen signed the paperwork for the pickup truck and he drove away from the dealership in the pickup truck following the purported purchase. Also, Mr. Chachere stated he referred to Mrs. Allen as Miss Boyd while in Defendant's presence.

A DVD recording of Defendant's interview following his arrest was played for the jury. Defendant maintained throughout his interview that he did not know what was going on. He stated that a woman named Laura or Lori, a friend of his wife from Texas, came to stay with them about four months prior to his arrest, because she was down on her luck. Defendant claimed he did not recall when she moved out, but heard that she was going to Texas. He was not home when she left because he was working. Defendant described Lori as having dark skin, a shade darker than his wife, short hair and that she was a bit taller and thicker than his wife. He was shown two lineups, one of which portrayed Lori Boyd, but he was not able to identify her from the lineup.

Defendant was questioned about his marriage and stated he had been married to Mrs. Allen for about seven to eight months. However, he did not know or remember the date or month of their marriage. Defendant was also questioned about how he acquired the pickup truck. According to Defendant, his wife told him that someone left him a gift, and took him to the dealership where he found the pickup truck parked on the side with the keys in it. Defendant stated he had not gotten around to registering the vehicle and did not know whose name was on the title of the

vehicle. Additionally, Defendant stated that he did not know how his wife obtained her car, the HHR. He said she had it a day or so before he got the pickup truck.

Defendant had difficulty recalling the names of his own sons and stated he was not aware whether or not his wife had any sons from her prior marriage. He also explained that his wife's relatives from Texas came for a visit about two weeks before his arrest. Defendant was unable to identify any names of the people there, nor did he know the number of people staying with them. According to Defendant, he stayed in his room and did not socialize with them.

After the State rested its case, the defense called its only witness to the stand, the Defendant. Defendant testified he first learned that the pickup truck was purchased in the name of Lori Boyd at the time he was arrested. He stated he was dumbfounded because he was led to believe one thing, but the situation was something else. Defendant maintained he knew nothing about the purchase.

Defendant denied ever going to Musson-Patout to meet with any of the salesmen. Further, he stated that Mrs. Allen has three sons ranging from 18 to 30 years old. According to Defendant, her oldest son is the same size as him. Defendant implied it must have been her son that accompanied her to Musson-Patout to purchase the pickup truck. Defendant, however, could not recall the son's name despite his having seen him several times. With regard to this son, the Defendant stated that he "didn't keep tabs on what was going on too much."

On cross-examination, Defendant confirmed that he had been with his wife for over a year and was asked why he did not know the names of his stepchildren. He replied that the children were grown, that he worked a lot and did not have time to snoop around. He stated he was not suspicious, and if they came by, he greeted and talked to them. Defendant refuted Mr. Cachere's testimony that he accompanied Mrs.

Allen to Musson-Patout to purchase the pickup truck. Again, Defendant referred to Mrs. Allen's son who he claimed to be large man like himself.

Defendant was asked if he had ever met a person named Lori Boyd, and the Defendant responded that a young lady that claimed to be Lori Boyd had moved in with them. According to Defendant, Mrs. Allen stated the lady was a friend of the family and he agreed to allow her to live with them for a while. Defendant added that he did not check her credentials and did not know if the lady was actually Lori Boyd.

On cross-examination, Defendant stated he did not know when Lori Boyd moved in or when she moved out. He recalled that Lori Boyd had a briefcase, which reportedly contained divorce papers and paperwork. Defendant recalled that Lori Boyd had moved out by the time the police showed up at his house on July 19, 2006, and that the briefcase was still there. When asked if Lori Boyd had left her briefcase behind, Defendant denied knowing anything about it, stating that he had not looked in it.

Defendant claimed he did not really know his wife, including her past criminal history. He described the situation as being like "something out of a television show." Defendant denied knowledge of Mrs. Allen's aliases, but stated she had a lot of paperwork she kept with her that he believed was from her prior divorce. Defendant stated he was not one to pry and that he worked a lot and did not have time to worry about things. He believed that his wife was taking care of him like a wife should and she did not arouse his suspicion.

With regard to the responsibility for paying household bills, Defendant stated that he would make the money and the deposit, while Mrs. Allen would take care of the bills because she had more time. Defendant denied ever retrieving the mail from the mailbox, claiming that he got home too late. As such, he never saw the mail,

including credit applications or his bills. He maintained he was unaware of what was happening because things were going about as they should. There was nothing to raise his suspicion. Defendant admitted he was aware that some payment books had come in, but he believed that his wife was taking care of them as well as the bills. On cross-examination he maintained that he was not aware that the payment books were in Lori Boyd's name. Defendant also had no explanation as to why the person named Lori Boyd filled out a credit application which stated that she was working at Bayou Pipe and listed him as a reference.

Defendant admitted driving the pickup truck from the time it was purchased in January 2006 to July 2006. He maintained he never once reached into the glove box to look at the registration, stating that he had no need to do so because he thought everything was legitimate. Defendant also denied looking in the glove box for an insurance card, claiming that his wife took care of the insurance.

Additionally, Defendant claimed he was being used and had no knowledge of his wife's actions. He complained that the police never believed him. Defendant testified he was never suspicious even though he had not received a hard license plate after having driven the vehicle for seven months. According to Defendant, his wife kept telling him that the license was in and that she was going to pick it up.

Defendant also testified his wife brought the pickup truck to him and said it was a gift, reportedly purchased with winnings from gambling. Defendant stated Mrs. Allen told him she won the money before they met and he did not ask questions about her winnings. He added that he figured she purchased the vehicle to make him happy by being a good wife.

On cross-examination, Defendant reiterated that Mrs. Allen brought the truck to him and said it was a gift. However, he could not explain the conflicting testimony

in his recorded statement, wherein he claimed to have gone to the lot at Musson-Patout where the truck was parked on the side with the keys in it and drove it away. He maintained, once more, that one of Mrs. Allen's sons must have been with her when the paperwork was completed. Defendant was also asked why he did not tell detectives in his recorded statement that he believed Mrs. Allen purchased the pickup truck with winnings from the casino. He stated he was shaken up and disturbed at the time and could not think straight.

Defendant was asked about the couple's income and testified that he was making about $9.50 an hour and she was making $6.00 an hour. Despite same, Defendant had no explanation as to how they could afford two brand new vehicles and a house based on their combined income.

When asked if he had ever been convicted of or pled guilty of a crime, Defendant responded affirmatively. He testified he pled guilty to issuing worthless checks, but maintained his innocence. Defendant testified he had been sitting in jail for nine months and decided to plead guilty to get out of jail. He denied any convictions prior to meeting Mrs. Allen. When asked if he divorced Mrs. Allen, he replied that he was being used from the start and that Mrs. Allen was already married.

Although Defendant denied having any knowledge of his wife's fraudulent purchase of the pickup truck and that he was present at Musson-Patout, the jury could have easily believed the testimony of the Musson-Patout employees which indicated Defendant was present at the time the pickup truck was purchased and that he drove the vehicle away from the dealership. These facts support the jury's finding that Defendant intentionally possessed, procured or received the pickup truck under circumstances which indicated he knew or had good reason to believe the pickup truck had been misappropriated by fraud. Accordingly, Defendant's conviction is

affirmed.

**DECREE**

For the foregoing reasons, Defendant's conviction is affirmed.

**AFFIRMED.**